614 A.2d 1146

**COMMONWEALTH of Pennsylvania**

v.

**Joyce D. LITTLE, Appellant.**

Superior Court of Pennsylvania.

Submitted April 9, 1992.

Filed July 31, 1992.

Harold Ciampoli, Asst. Dist. Atty., Montoursville, for Comm., appellee.

Before OLSZEWSKI, BECK and HOFFMAN, JJ.

OLSZEWSKI, Judge:

This is an appeal from judgment of sentence rendered by the Court of Common Pleas of Lycoming County on December 19, 1990. Following a jury trial, appellant was found guilty of two counts of simple assault by physical menace.[1] Appellant's post-trial motions were denied, and she was sentenced to a term of imprisonment not less than three months nor more than eighteen months. This appeal followed. Appellant proceeded *pro se* at trial and continues *pro se* on this appeal.

1. 18 Pa.C.S.A. § 2701(a)(3).

Appellant presents three issues for our consideration: first, whether the evidence presented at trial was insufficient to establish simple assault by physical menace; second, whether she was improperly denied her constitutional right to assistance of counsel; and third, whether she was denied the right to a fair and impartial trial. We affirm.

We adopt the facts of this case as summarized in the trial court opinion:

On [October 11, 1989], deputy sheriffs Debra Reed and Donald J. Turner were directed by the Lycoming County Sheriff's Office to perform a writ of execution for mortgage foreclosure on the property of Charles O. and Joyce D. Little, at R.D. # 1, Hughesville, and to serve the owners with a notice of sale.

During the trial, held on 22 August 1990 and 23 August 1990, both deputies testified that they arrived at the Little residence in a marked sheriff's car with official insignia on both sides of the vehicle. They were also both wearing their official uniform—blazers and trousers—with an insignia patch on the left front pocket of the blazer.

Upon reaching the Little residence, Deputy Reed set about completing the levy sheet by filling in a description of the property. At this time, Deputy Turner, who was in the driver's seat, glanced up and saw Mrs. Little coming out of the front door holding a shotgun. He immediately radioed for state police back-up unit assistance. Next, he rolled down his window and tried to speak to the defendant, whom he knew to be Mrs. Little from a previous encounter. He identified himself as a deputy sheriff from the Lycoming County Sheriff's Office, showed her his badge, and attempted to enter into a rational discussion with her. Defendant responded to Deputy Turner's sensible and courteous gestures toward her by firmly ordering the deputy sheriffs to get off her property. She then retreated back into to her house, only to make several more surprise entrances onto the porch with gun in hand. During one of these brief appearances, Mrs. Little yelled to the deputies that she knew they had radioed for back-up police, because she had

her scanner on. She also told them that she had called various news media and that at least one TV crew was on its way.

Because of what he perceived to be a potentially volatile situation, Deputy Turner decided that he would not attempt to personally hand Mrs. Little the papers, but would at least try to post the levy sheets on the house during one of her trips inside. He asked Deputy Reed to "cover him" while he walked to the house to post the papers. Deputy Reed exited the vehicle and drew her weapon to protect Deputy Turner as he walked up to the house with the levy sheets and staple gun. When he reached the residence, Deputy Turner discovered that the staple gun was empty. He also noticed that Mrs. Little had again appeared, still toting the shotgun. This time, she left the porch and began advancing toward Deputy Turner, reportedly coming within three to six feet of him. Deputy Turner, frightened and flustered dropped the levy sheets on a sign in the yard, returned to the vehicle and made a hasty departure.

The testimony of the deputies indicates that throughout the incident Mrs. Little behaved in a belligerent and hostile manner, shouting obscenities and refusing to enter into any dialogue with them.

At trial, the defendant asserted that on the eventful date of 11 October 1989, while doing her laundry, she was interrupted by a man's voice yelling at her to come out of her house. She peeked out of her front door and saw only the back end of a white car. Because of previous bad experiences in which her life was threatened by the driver of a white car, and because she was alone at the time, she was frightened, and picked up her shotgun to defend herself. Mrs. Little continually asserted that the deputies were not in uniform and that they never identified themselves to her; thus, it was not until after they left that she understood who the deputies were and why they had come.

Trial court opinion, June 18, 1991, at 2–4 (references to notes of testimony omitted).

■ Appellant first maintains that the evidence at trial was insufficient to prove simple assault by physical menace. Our review of challenges to sufficiency of the evidence is measured by a well-established standard:

> In reviewing the sufficiency of the evidence, we must decide whether the evidence, and all reasonable inferences deductible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense(s) beyond a reasonable doubt.

*Commonwealth v. Rollins,* 525 Pa. 335, 339, 580 A.2d 744, 746 (1990). The Crimes Code defines simple assault by physical menace as:

### § 2701. Simple assault

**(a) Offense defined.**—A person is guilty of assault if he:

\* \* \* \* \* \*

(3) attempts by physical menace to put another in fear of imminent serious bodily injury.

18 Pa.C.S.A. § 2701(a)(3). In his opinion, the Honorable Clinton W. Smith has provided a well-reasoned 10–page analysis of appellant's challenge to sufficiency of the evidence. In summary, we find that there was sufficient evidence to establish the elements of simple assault by physical menace since appellant erratically emerged from her home carrying a shotgun, shouting and advancing from her porch.[2] In fear of imminent serious bodily injury, the deputies radioed for state police back-up. Ultimately, they abandoned their attempt to post the levy sheets and instead opted to perform a "drop service" by dropping the papers on a post in appellant's yard. Viewed in the light most favorable to the Commonwealth, we find that the evidence abbreviated here and more fully explained in the trial court opinion, is sufficient to prove the crime of simple assault by physical menace beyond a reasonable doubt. Accordingly, we adopt that portion of the trial

**2.** At trial the Commonwealth and appellant stipulated that during the incident appellant was holding the gun "in the cradle," or in one arm, visible to onlookers. Although appellant never pointed the gun at the deputies, we find that her overall demeanor and actions were designed to, and did in fact, put the deputies in fear of imminent serious bodily injury.

court's opinion (pages 4–14) and find that appellant's claim is without merit.

Next, appellant asserts that she was denied her constitutional right to counsel since the trial court permitted her privately-retained counsel to withdraw.[3] We must first determine whether the trial court properly allowed appellant's trial counsel to withdraw. Pursuant to the Rules of Professional Conduct, there are certain situations where an attorney may be permitted to withdraw from representing a client. Specifically, Rule 1.16(b) provides:

**Rule 1.16. Declining or Terminating Representation**

(b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the client, or if:

\* \* \* \* \* \*

(4) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

Rules Prof. Conduct 1.16(b)(4), 42 Pa.C.S.A. (Purdon's Supp. 1992). With regard to withdrawal of counsel, this Court has held that:

There are no prophylactic rules which exist when determining whether a denial or withdrawal amounts to an abuse of discretion. Each case must be decided by balancing the competing interest giving due regard to the facts presented.

*Commonwealth v. Scheps*, 361 Pa.Super. 566, 576, 523 A.2d 363, 368 (1987), *allocatur denied*, 516 Pa. 633, 533 A.2d 91; *Commonwealth v. Sweeney*, 368 Pa.Super. 33, 47–48, 533 A.2d 473, 481 (1987).[4]

---

**3.** Appellant was denied public defender assistance because she did not meet the financial qualifications.

**4.** We note, however, that these cases were decided based on the application of former Disciplinary Rule 2–110 "Withdrawal from Employment," Code of Prof. Resp. DR 2–110, 42 Pa.C.S.A. (superceded by the Rules of Professional Conduct, April 1, 1988). Our research has disclosed no case law commenting on the application of Rule 1.16 of the Rules of Professional Conduct, *supra*, which is currently in force.

The record indicates that Michael Rudinski, Esq., represented appellant at her preliminary hearing and arraignment. Mr. Rudinski received a retainer fee for these services. Thereafter, Mr. Rudinski recommended that appellant enter into the Accelerated Rehabilitative Disposition Program (ARD). Appellant refused Mr. Rudinski's advice. Appellant then wrote Mr. Rudinski on February 1, 1990, refusing to pay $1,500 for the handling of her trial. (Official Record, Defendant's Motion to find in Contempt, Exhibit 1.) Rather, appellant proposed that Mr. Rudinski represent her at trial based on a contingency arrangement. *Id.* Appellant wrote,

> While I am well aware most attorneys in this area require ⅓ of any award as their fee, I believe this to be excessive; I am prepared to be generous but have no desire to "pad" anyone's bank account or pay for their European vacation. I am prepared to offer a fee in the 15–20 percent range, being fully aware that 15% is quite generous and the most ethical might consider 20% a bonus.

*Id.* In her letter, appellant continued by asking Mr. Rudinski to begin preparation of an action against the Lycoming County Sheriff's department seeking compensatory damages for the mental anguish she has suffered at their hands. *Id.* Appellant's confusion is apparent. She not only wanted Mr. Rudinski to represent her at trial but also in relation to a civil matter. For this service, she was willing to pay Mr. Rudinski a 15–20 percent contingent fee.[5] Based on her proposal, it is evident that appellant was unable to comprehend the separateness of the criminal and civil matters.

Mr. Rudinski next appeared in court on April 20, 1990, to request withdrawal. In his application, Mr. Rudinski petitioned for withdrawal because appellant refused to pay the requested trial fee and was acting in an uncooperative manner. At hearing on this matter, Mr. Rudinski stated that he told appellant from the beginning that he would not get involved in any civil matters, and that $1,500 would cover trial and

5. We note that attorney's are prohibited from entering contingent arrangements when representing a defendant in a criminal case. Rules Prof. Conduct 1.5(d)(2), 42 Pa.C.S.A. (Purdons Supp.1992).

sentencing. (N.T. 4/23/90 at 8.) By order of April 23, 1990, the Honorable Kenneth D. Brown denied Mr. Rudinski's petition for withdrawal since it was possible that appellant's case would be reached for trial in the current trial term. Judge Brown added, however, that in the event appellant's case was not reached within the current trial term, Mr. Rudinski could then request reconsideration of the order.

After Mr. Rudinski's petition to withdraw was denied, he contacted appellant by letter dated April 27, 1990, and included a contract again offering to perform trial and sentencing services for a flat fee of $1,500. (Official Record, Defendant's Motion to find in Contempt, Exhibit 2.) Appellant responded by letter of April 30, 1990, wherein she stated that Mr. Rudinski's offer was totally unacceptable and that she stood by her previous offer of a 20% contingency arrangement.

Appellant's case did not come to trial in the April term, and, citing the same reasons stated in his initial petition, appellant's counsel again requested withdrawal on May 16, 1990. On May 29, 1990, Judge Brown held a hearing on Mr. Rudinski's second motion to withdraw. At this hearing, appellant maintained that Mr. Rudinski's contract was unacceptable. (N.T. 5/29/90 at 3.) Since the parties could not resolve their differences, Judge Brown granted Mr. Rudinski's request for withdrawal and continued appellant's case until the July term in order to give her additional opportunity to obtain new counsel.

The posture of the instant case reveals that appellant refused to obtain counsel at trial by declining to acquire the services of Mr. Rudinski. Mr. Rudinski was willing to represent appellant and provided a contract which demanded a flat fee of $1,500. The price would include services incident to trial and sentencing. Appellant refused to accept this arrangement and instead proposed a contingency arrangement. The record reveals that appellant was well aware of her financial obligation and deliberately refused to pay for the services which she sought. Thus, the trial court did not abuse its discretion by allowing appellant's counsel to withdraw.

■ In addition, we find that appellant was not denied her constitutional right to counsel since she waived this right before trial. Appellant's case was rescheduled for the July trial term in order to provide time to secure substitute counsel. At a pre-trial conference on July 10, 1990, appellant appeared without counsel claiming that she was unable to obtain alternative counsel. Judge Smith, who was now presiding over the case, strongly advised appellant to obtain counsel and also advised her of a proposed trial date. At call of the list on July 23, 1990, appellant again appeared without counsel claiming that the Lord God Almighty was her attorney and that her son would assist her at the counsel table. (N.T. 7/23/91 at 1.) Since appellant considered the Lord God Almighty to be her counsel, she did not waive her right to counsel, but indicated that she did waive her right to a licensed attorney. (N.T. 7/23/91 at 3.) Before trial on August 22, 1990, the trial judge delivered an extensive colloquy regarding appellant's waiver of counsel. At this stage, the trial court was required to ascertain whether appellant was fully aware of the dangers of proceeding *pro se*. *Commonwealth v. Monica,* 528 Pa. 266, 272, 597 A.2d 600, 603 (1991). Rule 318(c) of the Rules of Criminal Procedure addresses waiver of counsel and provides:

**Rule 318. Waiver of Counsel**

\* \* \* \* \* \*

**(c) Proceedings Before a Judge.** When the defendant seeks to waive the right to counsel after the preliminary hearing, the judge shall ascertain from the defendant, on the record, whether this is a knowing, voluntary and intelligent waiver of counsel.

Pa.R.Crim.P., Rule 318(c), 42 Pa.C.S.A. In the case at bar, appellant was specifically advised of the right to counsel, the nature and elements of the charges against her, the range of permissible sentencing, the applicability of procedural rules, and the existence of possible defenses and rights which must be timely asserted. (N.T. 8/22/90, "Transcript of Waiver of Counsel Hearing," at 1–22.) In addition, Judge Smith inquired whether appellant was under the influence of drugs or

alcohol; whether she had ever been institutionalized for a mental disorder; and whether she was waiving her right to counsel in response to any outside threats or promises. *Id.* Thereafter, appellant executed a written waiver of counsel and has proceeded *pro se* up until this appeal. A thorough review of the trial judge's colloquy indicates that appellant was made fully aware of all necessary information and knowingly and voluntarily waived her right to counsel.

 Lastly, appellant contends that she did not receive a fair and impartial trial because the trial judge was prejudiced against her and the prosecution made inflammatory remarks. Appellant's argument on this issue is primarily unfocused. We find that her claims of trial judge bias are vague and unsubstantiated. With regard to her contentions of prosecutorial misconduct, we glean from appellant's argument that the prosecution allegedly made inflammatory statements about appellant's mortgage foreclosure. We note that a prosecutor must limit his statements to the facts introduced at trial and legitimate inferences therefrom. *Commonwealth v. Turner,* 390 Pa.Super. 216, 222–24, 568 A.2d 622, 625 (1989), *allocatur denied,* 527 Pa. 645, 593 A.2d 418. In addition, statements are only improper where they connote unavoidable prejudice, forming in the minds of the jurors a fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict. *Id.* Our review of the record indicates that the prosecutor's remarks were limited to the facts as they related to this incident and did not rise to the prejudicial level of prosecutorial misconduct.

Judgment of sentence is affirmed.

BECK, J., concurs in the result.

APPENDIX

[TRIAL COURT OPINION pp. 4–14]

three to six feet of him. N.T. 8/22/90 p. 22. Deputy Turner, frightened and flustered, dropped the levy sheets on a sign in the yard, returned to the vehicle, and made a hasty departure.

 

The testimony of the deputies indicates that throughout the incident Mrs. Little behaved in a belligerent and hostile manner, shouting obscenities and refusing to enter into any dialogue with them.

At trial, the defendant asserted that on the eventful date of 11 October 1989, while doing her laundry, she was interrupted by a man's voice yelling at her to come out of the house. She peeked out her front door and saw only the back end of a white car. Because of previous bad experiences in which her life was threatened by the driver of a white car, and because she was alone at the time, she was frightened, and picked up her shotgun to defend herself. Mrs. Little continually asserted that the deputies were not in uniform and that they never identified themselves to her; thus, it was not until after they left that she understood who the deputies were and why they had come.

## SUFFICIENCY OF THE EVIDENCE

Since this court must view Mrs. Little's appeal as a challenge to the sufficiency of the evidence, all the facts and all the permissible inferences drawn therefrom must be viewed in the light most favorable to the verdict winner. *Commonwealth v. Morris*, 522 Pa. 533, 564 A.2d 1226 (1989). Thus, the testimony of the deputy sheriffs is considered to be credible, and this court finds that the evidence presented at trial supports the jury's guilty verdict.

In order to prove the crime of simple assault by physical menace, the Commonwealth must establish the following elements: (1) that the defendant attempted to put the deputies in fear of imminent serious bodily injury, and took a substantial step toward that end, (2) that the defendant used physical menace to do this, and (3) that it was the defendant's conscious object or purpose to cause fear of serious bodily injury. *See* Pennsylvania Crimes Code Annotated, Section 2701(a)(3). In the remainder of this opinion, this court will address each of these elements in turn and discuss how the evidence presented at trial, when viewed in the light most favorable to

the Commonwealth, is sufficient to prove all the elements of the crime.

## I. *Fear of Imminent Serious Bodily Injury*

"Serious bodily injury" is defined in the Pennsylvania Crimes Code Annotated, Section 2301 as an "impairment of physical condition which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." Clearly, Mrs. Little's shotgun was capable of causing such harm, and by brandishing the weapon, she obviously intended to cause fear of serious bodily injury.

As indicated in the Facts section, several of Mrs. Little's actions could constitute the required "substantial step" toward putting the deputies in fear of serious bodily injury. Most obvious is her brandishing the shotgun while shouting obscenities and exhibiting hostile behavior toward them. She also took a literal as well as a figurative "substantial step" when she walked off the porch and advanced within 3–6 feet of Deputy Turner, with the ever-present weapon still in hand.

The embattled deputies' actions unquestionably show that Mrs. Little succeeded in her attempt to cause fear of serious bodily injury. The first step they took after being confronted by the armed defendant was to radio for back-up police to come to their aid. Secondly, before Deputy Turner attempted to post the house, he asked Deputy Reed to "cover him" with her weapon—a clear indication that he feared Mrs. Little might fire her gun at him. Thirdly, when Mrs. Little walked off the porch and advanced toward him, Deputy Turner quickly (and wisely) aborted his attempt to properly post the levy sheets and opted to drop them on a post in her yard and return to the car instead. Lastly, both deputies decided to leave the premises rather than wait for the back-up police to come to their aid. All these actions indicate that both deputies seriously feared for their safety.

The testimony at trial regarding their feelings during the encounter with the weapon-wielding defendant clearly bears this out. Both deputies stated several times that they were

frightened by Mrs. Little's behavior. As Deputy Reed explained:

> She kept going in and out of the house, which was very frightening because we didn't know where she was going to come back out from ... every time she went in the house, we—I constantly had to scan the perimeter because I didn't know if she would be coming back out from the rear of the house, from the front, the side, we didn't know if there was anyone in the garage—we just constantly had to keep scanning.

N.T. 8/22/90 p. 23. Deputy Turner testified that he too was frightened by Mrs. Little's behavior: "She was holding a shotgun, and I had—I was scared ... I had no idea what she would do." N.T. 8/22/89 p. 38. In fact, he even abandoned his attempt to post the levy sheets, and decided instead to perform a "drop service" by leaving the papers on the premises, rather than handing them to Mrs. Little directly. When questioned about the circumstances under which a drop service would be used, Deputy Turner answered "when it's extreme hazard that we may be in fear of bodily injury or that we are in fear of our life ..." N.T. 8/22/90 p. 48.

The court recognizes that whether the deputies were actually fearful is, in and of itself, irrelevant, and that the issue is what Mrs. Little attempted. However, we find that all of the above stated facts are indeed relevant to show what Mrs. Little attempted, because she continued to brandish the shotgun after being fully aware of the fear it was creating—she saw the deputies' reactions and heard them radio for help. Thus, the only rational conclusion is that the defendant did indeed attempt to put the deputies in fear of imminent serious bodily injury.

## II. *Menacing or Frightening Activity*

The primary issue in this case, as the court views it, is whether Mrs. Little's actions constituted physical menace. It

is well settled in Pennsylvania case law that pointing a gun at someone constitutes simple assault by physical menace.[1] In the instant case, however, the Commonwealth does not assert that Mrs. Little ever pointed her shotgun at the deputies. Because this court could find no case law addressing the issue of whether merely brandishing a weapon constitutes physical menace, we must look to the totality of the circumstances and evaluate the defendant's behavior throughout the incident to determine whether or not Mrs. Little used physical menace.[2]

As described in the Facts section of this opinion, Mrs. Little not only carried the shotgun, but she repeatedly ordered the deputies off her property and shouted obscenities at them. Moreover, with her sudden and erratic appearances and disappearances on and off of the porch—with shotgun in hand—she clearly attempted to frightened both deputies. Although she never actually threatened to shoot them, the mere act of toting a shotgun while exhibiting such combative, antagonistic, and hostile behavior clearly constitutes an *implied* threat—"Get off my property ... or else!"—which came through loud and clear.

Perhaps Deputy Turner described it best when, during cross-examination, Mrs. Little asked him what she had done to threaten him.[3] He replied, "You told me to get off your property, it was private property and we were trespassing while you were brandishing a shotgun. I perceive that as a threat against my person. In fact, I see that as an extreme threat against my person." N.T. 8/22/90 p. 54.

1. See *Commonwealth v. Maxwell*, 355 Pa.Super. 575, 513 A.2d 1382 (1986), Alloc. dism., 524 Pa. 53, 569 A.2d 328; *Commonwealth v. Bryant*, 282 Pa.Super. 600, 423 A.2d 407 (1980); *Commonwealth v. Savage*, 275 Pa.Super. 96, 418 A.2d 629 (1980).

2. See *Commonwealth v. Diamond*, 268 Pa.Super. 326, 408 A.2d 488 (1979), where the court ruled that a person is held responsible for the forseeable consequences of his behavior, and that the surrounding circumstances known to a person may be taken into account when considering and evaluating these actions.

3. Mrs. Little represented herself at trial.

In addition to holding the gun "in the cradle"[4] during each of her brief appearances, Mrs. Little also walked off the porch at one point and advanced toward Deputy Turner, coming within 3–6 feet of him—another concrete use of physical menace.

Pennsylvania case law clearly supports the court's finding that Mrs. Little's used physical menace. A look at some of the physical menace cases reveals that a person may indeed commit simple assault by physical menace without verbally threatening the victim. Neither must the defendant actually point a weapon or hold the weapon in a striking position. In *Commonwealth v. Diamond,* 268 Pa.Super 326, 329, 408 A.2d 488 (1979), appellant was one of two men running in the street in the direction of a car driven by victim Hinds. Mr. Hinds swerved to avoid hitting them. Shortly afterwards, he stopped at a red light, and appellant ran up to the passenger door of the car and put his hand on the door handle. The *Diamond* court found that:

"by approaching Hinds' car at 4:00 a.m. and gripping the door handle, appellant 'attempt[ed] by physical menace to put [Hinds] in fear ... A reasonable person, accosted in his car at 4:00 a.m. on the street, will quite likely fear that such an injury is imminent."

In *Commonwealth v. Hudgens,* 400 Pa.Super. 79, 87–89, 582 A.2d 1352, 1357 (1990), we can examine another circumstance where a deadly weapon was brandished. In this case, during a heated argument, appellant informed victim Swope that he would "get him." Hudgens removed a sword which was concealed in his trousers, held it within five to six inches of Swope's body, and touched Swope's hand with the sword. Appellant averred that Swope was not placed in fear of serious bodily injury because the victim testified that appellant never attempted to strike Swope, and never even held the sword in a striking position. Yet the court still ruled that there was

4. The Assistant D.A. and Mrs. Little stipulated that during the incident Mrs. Little was holding the gun "in the cradle," or held in one arm, visible to onlookers. N.T. 8/23/90 p. 3.

"ample evidence to sustain appellant's conviction for simple assault."

A similar situation is found in *Commonwealth v. Dicenzo*, 260 Pa.Super. 12, 393 A.2d 988 (1978). In this case, appellant and his companion were arrested after "prowling." While the officer physically restrained the companion, appellant "moved up the driveway a short distance to pick up a stone. He yelled to the officer that he [appellant] would 'bash my [the policeman's] brains in' if he came closer. Appellant fled but later gave himself up at the magistrate's office." Dicenzo's actions, although accompanied by a verbal threat, appear to this court far less menacing than the actions of Mrs. Little, who, although she made no specific *verbal* threat, certainly communicated a serious *implied* threat, and held in her hand a shotgun, as opposed to a stone.

After consideration of the above cases, this court finds that Mrs. Little's behavior during the incident in question is every bit as menacing as any of the cases discussed above, and therefore that the evidence clearly supports the second element of the crime—that Mrs. Little's behavior constituted a use of physical menace.

### III. Conscious Object or Purpose

The final criteria for the charge simple assault by physical menace is that the defendant's conduct must be intentional—it must have been her conscious object or purpose to cause fear of serious bodily injury. In 18 Pa.C.S. 302(b), intent is defined as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result

In the case of *Commonwealth v. Gregory*, 267 Pa.Super 103, 108, 406 A.2d 539, 542 (1979), the court addresses the issue of intent, and states the following:

As intent is a subjective frame of mind, it is of necessity difficult of direct proof . . . we must look to all the evidence

to establish intent, including, but not limited to, appellant's conduct as it appeared to his eyes.

Other appellate courts have issued similar statements on the proving of intent. In *Commonwealth v. Russell,* 313 Pa.Super. 534, 543, 460 A.2d 316, 321 (1983), the court ruled: "Intent can be proven by direct or circumstantial evidence; it may be inferred from acts or conduct or from the attendant circumstances." *See also Commonwealth v. Thomas,* 465 Pa. 442, 447, 350 A.2d 847, 849–50 (1976), where the court found that "[a] finder of fact is not bound by an actor's stated intention but may find that he intended the natural and probable consequences of his act." *See also In Interests of J.L.,* 327 Pa.Super. 175, 475 A.2d 156, 157 (1984) and *Commonwealth v. Alexander,* 477 Pa. 190, 383 A.2d 887 (1978).

In the instant case, this court finds that the surrounding circumstances clearly indicate that Mrs. Little fully intended to put the deputies in fear of serious bodily injury, and that this intention may be inferred from her actions. Indeed, the only other explanation for her exploits would be that she was unaware of the deputies' identity and purpose in coming on her premises. In viewing the evidence in the light most favorable to the verdict winner, as we must do, this court will accept the testimony of the deputies as true, as stated in the Facts section, and finds that: (1) the deputies arrived at the Little residence in a sheriff's vehicle, marked with the official insignia, (2) the deputies were wearing their official uniforms, (3) Deputy Turner repeatedly told Mrs. Little who they were and why they had come, (4) Deputy Turner produced his badge of authority and showed it to Mrs. Little, (5) Mrs. Little yelled to the deputies that she had her scanner on, and that she knew who they were and that they had called for back-up police assistance, (6) Mrs. Little never telephoned the police to help her, as one would expect any frightened person to do, and (7) Mrs. Little did, however, telephone the media, urging them to come and film the scene.[5]

5. In her testimony, Mrs. Little stated that she did not call the police because the nearest headquarters was located some distance from her home, and she did not believe they would arrive in time to provide her

In light of the above findings of fact, this court finds that Mrs. Little was fully aware of the identity of the deputies, and it was her conscious object and purpose to frighten them into leaving with the implied threat that she would fire her shotgun at them if they did not. The evidence presented at trial indicates that her actions effectively got this point across.

## CONCLUSION

Although Mrs. Little never pointed her shotgun directly at the deputies or verbally threatened to shoot them, this court finds that her actions certainly constituted an implied threat, which was every bit as menacing and frightening to the deputies. In evaluating the circumstances surrounding the case, this court finds that the defendant deliberately and intentionally put Deputy Turner and Deputy Reed in fear of serious bodily injury. We further find that she did this through the use of physical menace, which consisted of brandishing a shotgun while engaging in hostile and threatening behavior that included the following actions: ordering the deputies to leave, shouting obscenities at them, refusing to listen to them or enter into dialogue with them, repeatedly entering and exiting the house in an erratic and unpredictable manner, and advancing off the porch to within 3–6 feet of Deputy Turner. Any reasonable person would fear for his or her safety when confronted with a pugnacious, shotgun-toting individual behaving in a combative and hostile manner. Thus, this court finds that the evidence clearly supports the jury's verdict that the defendant is guilty of two counts of simple assault by physical menace.

with the emergency assistance she needed. However, the court notes that the newspaper and television stations which she did call are located in Williamsport, some 15–20 miles away.