J-S43026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MOHAMMED RASOOL KHA AL JUMAILI | : | |
| | : | No. 43 EDA 2025 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered November 26, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0006310-2022

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:           **FILED MARCH 2, 2026**

Mohammed Rasool Kha Al Jumaili appeals from the judgment of sentence imposed following his convictions for terroristic threats, simple assault, and recklessly endangering another person ("REAP").[1] He challenges the sufficiency of evidence to support his convictions. We affirm.

Al Jumaili was charged with the above crimes following an investigation into a road-rage incident. At his jury trial, the Commonwealth called two witnesses. First, Michelle Young testified that on July 13, 2022 at approximately 11:00 a.m., she was driving her daughter to work at Walmart on Blair Mill Road in Williow Grove. N.T., 3/7/24, at 14. She stated that as she was driving down Welsh Road, she approached an intersection at Twinning Road. *Id.* at 15. Young stated that there was traffic near the intersection

_____

[1] 18 Pa.C.S.A. §§ 2706(a)(1), 2701(a)(3), and 2705, respectively.

because of construction work. *Id.* at 16. Young testified that she was in the right lane but due to the construction, she had to "merge over to the left." *Id.* at 17. She saw Al Jumaili's vehicle at the intersection. *Id.* Young testified the following then occurred:

> A My light was green and [Al Jumaili's] light was red. He was trying to come out into the intersection to cut my vehicle off, and I didn't let him out because it was my light.
>
> Q Okay. And what happened next?
>
> A Once his light came, he started trailing my vehicle. And I looked in my rearview mirror and I saw him trailing my vehicle.
>
> Q Okay. Did you hear anything at that time?
>
> A He was beeping his horn.
>
> Q Okay. And then what happened next.
>
> A He called out to me on the left side and had a gun in his hand.
>
> Q Okay. So I want to start with the first time you hear his voice. What's he saying?
>
> A He said, "Not in my hood, nigger bitch."
>
> Q Okay. And do you remember what your reaction to that was?
>
> A Before he pointed his gun, like he lifted his arm, I was laughing because I couldn't believe that this guy was trailing my vehicle.
>
> Q And why were you laughing?
>
> A Because I didn't think it was, like, going to escalate to that before he caught me.
>
> Q Okay. And so you said that you saw him raise his arm. Did anything draw your attention to that moment?
>
> A Somebody picking up their arm with a gun.

Q Okay. And what did you do when you saw that gun?

A I tried to speed my vehicle up and I got back over into the right lane.

Q Okay. Were you afraid he might use the gun?

A Yes, I was.

Q Okay. And what did you do, if anything, to protect yourself from the possibility of being shot at?

A My daughter put her seat back and I dipped, like, down, like trying to keep to where I could see the traffic.

Q Okay. And at that time what was your daughter doing?

A She was on the phone and she was trying to call 9-1-1.

. . .

Q Okay. At any point before today, have you ever seen the gun [Al Jumaili] used besides at that roadside?

A No, I have not.

Q So no one's ever shown it to you?

A No, they haven't.

Q. Can you describe what that gun looked like?

A It was a black handgun, like a semi-automatic small one. I know you put the clip in the bottom.

. . .

Q Okay. What happened next?

A 9-1-1 said to follow the vehicle and see where the person went and then she would send a car out so that I can identify him.

Q Okay. And did that happen?

A Yes, it did.

Q Okay. Where did [Al Jumaili's] car go?

A He was at Lowe's.

*Id.* at 17-22.

Detective Francis J. Gallagher next testified that after the police received a 9-1-1 call of a road rage incident involving a firearm, the police located Al Jumaili at Lowes and asked him to go to the police station. *Id.* at 28-29. Detective Gallagher said that Al Jumaili was cooperative, drove to the police station, and signed a written statement. *Id.* at 34, 42-43. Detective Gallegher read portions of Al Jumaili's statement to the jury:

> Q . . . I'm going to read that first question. "At any point during this intersection with the people in the silver sedan did you show them the gun that you had in the car?"
>
> A The answer is: "Yes, I did."
>
> Q "When did you show them the gun that you had in your car?"
>
> A "Answer: Right after they had cut me off."
>
> Q "Was the gun in a holster, out of the holster, or something different when you showed them the gun?"
>
> A "Answer: It was out of the holster."
>
> Q "Why was the gun out of the holster?"
>
> A "Answer: I showed them the gun."
>
> Q "Where was the muzzle facing when you showed them the gun?"
>
> A "Answer: The muzzle was facing the driver's side door as the gun was in front of my chest."
>
> Q "Was the gun inside a holster as it was sitting in your driver's side door?"
>
> A "Answer: Yes, definitely."
>
> Q "Why did you choose to un-holster the weapon while showing it to them?"

A "Answer: I wanted to show them that I had a gun and I did not believe that they would have recognized the gun had it been holstered."

Q "What, if anything, did you say to the people in the silver car while showing them your gun?"

A "Answer: Don't do that in my neighborhood."

*Id.* at 43-44.

Al Jumaili testified on his own behalf. He testified that on July 13, 2022, as he was exiting his apartment complex in his vehicle to go to Lowes, "there was a construction site on -- a construction zone next to the right-side lane" so he "tried to merge left," but "[t]here was a car coming behind [him] and drove to the -- to [his] left side and then cut [him] off to the front." *Id.* at 57. Al Jumaili stated he then started beeping his horn at Young, the other driver. *Id.* He denied using a racial slur or pointing his gun at Young. *Id.* at 58. However, he testified, "[t]he gun was in my left-side pass – my left-side door. I lifted [it] up going to the steering wheel, chest level, and then I placed it right on the passenger's side." *Id.* While he was doing that, he said to Young, "Don't do that in my neighborhood." *Id.* at 63-64. On cross-examination, Al Jumaili testified:

Q And while you were telling them ["Don't do that in my neighborhood"], you did show them the gun; right?

A Yes, I did.

Q And you did that because you wanted them to know that you had a gun?

A Yes.

*Id.* at 64.

Al Jumaili also testified that he had a license to carry a firearm on the date of the incident. *Id.* at 62. He also presented one character witness. *Id.* at 65-68. The jury convicted Al Jumaili of two counts each of terroristic threats, simple assault, and REAP. The court sentenced him to six to 23 months' incarceration followed by three years' probation on the terroristic threats counts, with no further penalty on the other counts. Al Jumaili filed a post-sentence motion, which the court granted in part and denied in part. This appeal followed.

Al Jumaili raises the following issues:

1. Was the evidence insufficient to convict [Al Jumaili] of Terroristic Threats as there was insufficient evidence to prove beyond a reasonable doubt that [Al Jumaili] communicated a threat of violence to the complainants?

2. Was the evidence insufficient to convict [Al Jumaili] of Simple Assault as there was insufficient evidence to prove beyond a reasonable doubt that [Al Jumaili] placed the complainants in fear of imminent serious bodily injury and/or that his actions constituted a physical menace?

3. Was the evidence insufficient to convict [Al Jumaili] of [REAP] as there was insufficient evidence to prove beyond a reasonable doubt that [Al Jumaili] acted recklessly and/or placed the complainants in danger of death and/or serious bodily injury?

Al Jumaili's Br. at 3.

Al Jumaili's issues challenge the sufficiency of the evidence. The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." *Commonwealth v. Mikitiuk*, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a challenge

to the sufficiency of the evidence, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." ***Commonwealth v. Feliciano***, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." ***Id.*** (citation omitted). This standard applies equally where the Commonwealth's evidence is circumstantial. ***Commonwealth v. Patterson***, 180 A.3d 1217, 1229 (Pa.Super. 2018).

This Court "may not substitute [its] judgment for that of the factfinder." ***Commonwealth v. Griffith***, 305 A.3d 573, 576 (Pa.Super. 2023). The factfinder, "while passing on the credibility of the witnesses and the weight of the evidence – is free to believe all, part, or none of the evidence." ***Commonwealth v. Miller***, 172 A.3d 632, 640 (Pa.Super. 2017). A "complainant's testimony alone is sufficient to sustain a conviction for a criminal offense, 'so long as that testimony can address and, in fact, addresses, every element of the charged crime.'" ***Commonwealth v. Horlick***, 296 A.3d 60, 62 (Pa.Super. 2023) (quoting ***Commonwealth v. Johnson***, 180 A.3d 474, 481 (Pa.Super. 2018)).

Al Jumaili first challenges the sufficiency of the evidence to support his conviction for terroristic threats. He argues that there was no evidence that he verbally threatened Young or her daughter with a crime of violence. Al

Jumaili's Br. at 9. Al Jumaili maintains that the only evidence of any alleged verbal statement made by him was Young's claim that he said, "Not in my hood, nigger bitch." *Id.* at 10. Such a statement, he claims, "while repugnant, cannot be considered a terroristic threat." *Id.* Al Jumaili emphasizes that Young never testified that he pointed the gun at her. *Id.* at 11. Rather, he notes that Young's testimony was that "she saw [him] 'with a gun in his hand' that '[b]efore he pointed the gun, like, he lifted his arm' and that she saw '[s]omebody picking up their arm with a gun.'" *Id.* He argues that "[t]he producing and brandishing of a firearm, alone, has never been sufficient to prove" the crime of terroristic threats. *Id.* at 9. Al Jumaili concludes that since "[t]here was no testimony of a verbal threat to use the firearm nor was there any evidence that the firearm was ever pointed at either complainant," there was insufficient evidence to support his conviction for terroristic threats. *Id.* at 11.

The crime of terroristic threats occurs "if the person communicates, either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S.A. § 2706(a)(1). The Commonwealth may sustain its burden where it proves beyond a reasonable doubt that "1) the defendant made a threat to commit a crime of violence, and 2) the threat was communicated with the intent to terrorize another or with reckless disregard for the risk of causing terror." *Commonwealth v. Beasley*, 138 A.3d 39, 46 (Pa.Super. 2016) (citation omitted). "Neither the ability to carry out the threat nor a belief by the person threatened that it will be carried out

is an essential element of the crime." ***Commonwealth v. Kline***, 201 A.3d 1288, 1290 (Pa.Super. 2019) (alteration removed, citation omitted). "Rather, the harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." ***Id.*** (citation omitted).

Section 2706 "is not meant to penalize mere spur-of-the-moment threats which result from anger." ***Commonwealth v. Sexton***, 222 A.3d 405, 418 (Pa.Super. 2019) (citation omitted). Nevertheless, "being angry does not render a person incapable of forming the intent to terrorize." ***Id.*** (citation omitted). "In reviewing a statement alleged to be a terroristic threat, we do not look at the statement in a vacuum." ***Commonwealth v. Anneski***, 525 A.2d 373, 376 (Pa.Super. 1987). Instead, "we must look at the statement in light of all the surrounding circumstances." ***Commonwealth v. McGraw***, 344 A.3d 813, 817 (Pa.Super. 2025) (citation omitted). Further, certain non-verbal gestures may constitute a communication under Section 2706. ***See Kline***, 201 A.3d at 1291-92 (finding evidence was sufficient to support terroristic threats conviction when defendant used a non-verbal hand gesture of "a shooting gun recoiling" toward victim; defendant's gun gesture incident coupled with his past stalking-like behavior in relation to the victim communicated a threat to commit a crime of violence with intent to terrorize the victim).

Here, viewing the facts in the light most favorable to the Commonwealth, we conclude that the evidence was sufficient. Young testified

that Al Jumaili purposefully followed her vehicle after the intersection and repeatedly beeped his horn at her. She stated that he then pulled beside her, visibly raised his firearm, and stated, "Not in my hood, nigger bitch." Aside from denying that he used a racial slur, Al Jumaili did not dispute Young's version of events. In fact, he admitted that he took the firearm out of the holster and deliberately showed it to Young and her daughter. *See* N.T. at 44 (Al Jumaili's statement, wherein he states, "I wanted to show them that I had a gun and I did not believe that they would have recognized the gun had it been holstered"). Young further testified that she was afraid that Al Jumaili would use the gun. As a result, she ducked down in her seat, and her daughter reclined her seat down while calling 911.

Al Jumaili's contention that his conviction for terroristic threats was insufficient because he did not point the gun at the victims is without merit. We must look at the totality of the circumstances. ***See McGraw***, 344 A.3d at 817. Al Jumaili's actions – including his intense pursuit of the victims, yelling at the victims, and displaying a gun to the victims so they would know that he had it – constituted a threat to commit a crime of violence with the intent to terrorize another or with reckless disregard for the risk of causing terror. The evidence was thus sufficient to support Al Jumaili's conviction for terroristic threats beyond a reasonable doubt.

Al Jumaili next argues that the evidence was insufficient to support his conviction for simple assault. Al Jumaili acknowledges that "the act of pointing a gun at someone may constitute simple assault as an attempt by physical

menace to put another in fear of imminent serious bodily injury." Al Jumaili's Br. at 13 (quoting Trial Court Opinion, filed 6/12/25, at 10). However, Al Jumaili again stresses that there was no evidence that he pointed the gun at the victims. *Id.* He argues that "[s]howing or brandishing a firearm is not the equivalent of pointing a firearm at another individual, otherwise, a complainant could claim physical menace at the very sight of a weapon or firearm, without anything more." *Id.* According to Al Jumaili, "[b]ecause there is no evidence that [he] pointed his firearm at the complainants, and because the record is devoid of any other action from which this Honorable Court could conclude that the complainants were in fear of imminent serious bodily injury, the evidence was . . . insufficient to sustain" his conviction for simple assault. *Id.* at 14.

A person is guilty of simple assault if he "attempts by physical menace to put another in fear of imminent serious bodily injury[.]" 18 Pa.C.S.A. § 2701(a)(3). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* at § 2301. To prove simple assault by physical menace, "[t]he elements which must be proven are intentionally placing another in fear of imminent serious bodily injury through the use of menacing or frightening activity." *Commonwealth v. Reynolds*, 835 A.2d 720, 726 (Pa.Super. 2003) (citation omitted). "Intent can be proven by circumstantial evidence and may

be inferred from the defendant's conduct under the attendant circumstances. **Id.** (citation omitted).

A defendant in possession of a gun need not point it at the victim to be found guilty of simple assault by physical menace. Rather, when determining "whether merely brandishing a weapon constitutes physical menace, we must look to the totality of the circumstances and evaluate the defendant's behavior[.]" **Commonwealth v. Little**, 614 A.2d 1146, 1152 (Pa.Super. 1992). In **Little**, this Court affirmed a conviction for simple assault by physical menace where the appellant "erratically emerged from her home carrying a shotgun, shouting and advancing from her porch" at deputies while they were attempting to serve her with mortgage foreclosure papers. **Id.** at 1148. The parties stipulated that during the incident the appellant "was holding the gun 'in the cradle,' or held in one arm, visible to onlookers." **Id.** at 1148 n.2. This Court found that "[a]lthough [the] appellant never pointed the gun at the deputies," the appellant's "overall demeanor and actions were designed to, and did in fact, put the deputies in fear of imminent serious bodily injury." **Id.**

Here, our review of the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, reveals that there was sufficient evidence to establish that Al Jumaili intentionally put the victims in fear of imminent serious bodily injury by the use of physical menace. The record demonstrates that Al Jumaili displayed a firearm while yelling at Young after he chased and honked after her vehicle. As a result, Young sped up and changed lanes. Young testified that she was scared that Al Jumaili would use

the firearm and therefore ducked down while her daughter called 911. Al Jumaili admitted that he intended the gun to be seen by the victims. Based on the totality of the circumstances, we conclude the jury could reasonably infer that Al Jumaili's actions were done with the requisite intent to place the victims in fear of imminent serious bodily injury by physical menace. Accordingly, Al Jumaili's sufficiency challenge to his conviction for simple assault fails.

Lastly, Al Jumaili argues that the evidence was insufficient to support his conviction for REAP. He argues that his firearm did not at any time discharge and reiterates that the firearm was never pointed at the complainants. Al Jumaili's Br. at 15.

A person commits REAP "if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705. To prove REAP, the Commonwealth must show that the defendant "(1) possessed 'a *mens rea* [of] recklessness,' (2) committed a wrongful deed or guilty act ('*actus reus*'), and (3) created by such wrongful deed the danger of death or serious bodily injury to another person." **Commonwealth v. Emler**, 903 A.2d 1273, 1278 (Pa.Super. 2006) (citation omitted).

"Recklessness" is defined as "a conscious disregard of a known risk of death or great bodily harm to another person." **Id.** (citation omitted). As set forth above, "serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement,

or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. REAP "requires the creation of danger, so the Commonwealth must prove the existence of an actual present ability to inflict harm to another." *Commonwealth v. Shaw*, 203 A.3d 281, 284 (Pa.Super. 2019).

Here, the trial court found that the evidence was sufficient for the jury to find Al Jumaili guilty of two counts of REAP. *See* Trial Ct. Op. at 12. Viewing the evidence in the light most favorable to the Commonwealth, we agree. The evidence showed that Al Jumaili initiated the incident when he trailed Young and her daughter. He then pulled up next to Young's moving vehicle and yelled at her. The record indicates that traffic was congested and they were traveling through a work zone. Al Jumaili then purposely brandished his firearm to Young, which caused her to duck down while still driving. Young testified that, while ducking down and driving, she sped up her vehicle and changed lanes. Al Jumaili possessed the *mens rea* of recklessness when he engaged in the wrongful conduct that created an actual danger of death or serious bodily injury to Young and her daughter. Thus, the evidence was sufficient to support his conviction of REAP.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/2/2026