**UNITED STATES**

v.

**Airman Basic Clinton CALHOUN, III, FR276–68–2964 United States Air Force.**

**ACM 32314.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 28 June 1996.

Decided 26 Aug. 1997.

Pearson, Senior Judge, filed a dissenting opinion.

Appellate Counsel for Appellant: Colonel David W. Madsen, Lieutenant Colonel Kim L. Sheffield, Major Ray T. Blank, Jr., Captain Harold M. Vaught, Captain Jeffrey B. Miller, and Captain Michael L. McIntyre.

Appellate Counsel for the United States: Colonel Theodore J. Fink, Lieutenant Colonel Michael J. Breslin, and Major LeEllen Coacher.

Before PEARSON, MORGAN, C.H., II, and MORGAN, J.H., Appellate Military Judges.

## OPINION OF THE COURT

MORGAN, C.H., II, Judge:

After convicting appellant contrary to his pleas of obstruction of justice, subornation of perjury, and conspiracy to commit perjury, a general court-martial consisting of officer members sentenced him to a dishonorable discharge and confinement for 30 months. We hold appellant was denied effective assistance of counsel and reverse.

### Facts

Appellant's lengthy sojourn through the military justice system began with his declination of nonjudicial punishment offered for driving on-base while under revocation,[1] and for disobeying the order of a security policeman to stop. The government called appellant's bluff and convened a special court-martial for disobeying the lawful order of the commander. Appellant, then a technical sergeant, was represented at this first court-martial by Captain (Capt) K, the area defense counsel (ADC), and by a civilian attorney, Mr. Keene.

At the first trial, conducted from October 12–14, 1995, at Barksdale Air Force Base (AFB), Louisiana, appellant staged an alibi defense. It was brought out through the sworn testimony of a number of witnesses, including appellant's three teenage daughters, one Regina Cole, and appellant's brother, Anthony Calhoun, that Anthony had been the one actually driving the car on May 13, and that appellant was with another woman at the time. Anthony, who apparently closely resembled appellant, was a contracting specialist employed by the Department of the Air Force at Brooks AFB, Texas. The gist of the story was that Anthony, who was married, had come to town for a secret tryst with Regina Cole, and had borrowed appellant's car.

This precarious house of cards collapsed, however, when it became clear that the prosecution had solid evidence in the form of telephone and hotel records to show that Anthony was nowhere near Barksdale AFB at the time in question, but was on a temporary duty assignment attending class in Oxnard, California. Brought back to the court-martial after attempting to skip town, Anthony refused further testimony on self-incrimination grounds.

Appellant then shifted fields completely and changed his plea to guilty. In a sworn providence inquiry, appellant admitted that it had indeed been he who was at the wheel and ignored a security policeman's order to stop on the night in question. Members, after listening to a tailored mendacity instruction, sentenced appellant to reduction to airman basic, confinement for 110 days, and a reprimand.

Attention immediately centered on the question of whether Capt K had abetted that perjury. The government came into possession[2] of appellant's copy of an October 3, 1995, letter written by Capt K to Mr. Keene. The letter related the difficulties Capt K had experienced in working with appellant and marshalling a trial strategy for the forthcoming court-martial. It recounted appellant's story, told to Capt K, that a man named "Binky" had actually been at the wheel of the car, but that appellant had been unsuccessful in locating him to testify. (The Binky story was the same tale that appellant had at first

---

1. The base commander had revoked appellant's driving privileges for the accumulation of 12 traffic points in a 12 month period. It turned out, ironically, that there had been a miscalculation, and that appellant had only accumulated 11 points. This was unknown to appellant at the time he elected to refuse nonjudicial punishment, but subsequently became the subject of his original ineffective assistance of counsel claim before us. Appellant argues before us that military counsel at his special court-martial should have spotted the mistake, and that but for his failure to do so, appellant wouldn't have needed to orchestrate a perjured defense. Although unnecessary to our resolution of this case, we reject this assignment of error out-of-hand.

2. Appellant had left a fellow airman, Airman First Class Shuntesia Clark, with a power of attorney to take care of his household effects while he was in confinement. She came across the memorandum, and turned it over on her own initiative to the authorities. There is no question now, or then, as to the legitimacy of the government's possession of that memorandum.

tried to peddle to authorities while he was contesting his nonjudicial punishment.) In pertinent part it stated:

> Sgt Calhoun told me about how he had formerly planned on having his brother testify on his behalf since Calhoun could not find Binky. He changed his mind because he did not want his brother to lie for him. I told him I was glad he decided that. . . .

On the surface, this was damning evidence against Capt K, seemingly demonstrating advance knowledge that what appellant's brother would have to say would be perjurious. This is certainly how the government took it. Reacting swiftly, authorities opened an Air Force Office of Special Investigations (AFOSI) case on Capt K for subordination of perjury and conspiracy to commit perjury. For the time, at least, appellant's case took a back seat to that of his military lawyer. Extensive coordination was undertaken along a stove-pipe chain of command within The Judge Advocate General's Department. The Barksdale staff judge advocate (SJA) coordinated with the SJA to the 8th Air Force Commander, who was the general court-martial convening authority, and, as it happened, located in the same building. Both SJA's agreed there was probable cause to search Capt K's office for further evidence of his complicity in putting on perjury at appellant's trial.

At this point, what was already an extraordinary situation became more so, as policies internal to The Judge Advocate General's Department came into play. The Judge Advocate General (TJAG) Policy Number 24, Compelling Defense Counsel to Produce Evidence, addresses the situation where an ADC becomes the subject of a criminal investigation:

> The Commander, Air Force Legal Services Agency, (AFLSA/CC), is the commander of all [Air Force] military defense counsel. Consequently, as a matter of comity, should it ever appear necessary to obtain a search authorization or any other kind of process against an area defense counsel, his or her house, or the ADC office, the base staff judge advocate will notify AFLSA/CC, or the Director, USAF Judiciary.

The trial judge's finding of fact says that the base staff judge advocate "over a period of days" discussed the situation with the AFLSA commander, then a colonel, now a brigadier general. When she took the stand the base SJA testified that she had "coordinated" with the AFLSA commander before formally undertaking a search, and that he had a hand in making the necessary contacts and arrangements preceding the search.

The matter was also carefully discussed with the special court-martial convening authority, a brigadier general. It was decided that the search would be conducted by an AFOSI special agent not assigned to Barksdale, and by a reserve judge advocate, a lieutenant colonel, who also had no previous connection with the base. In turn, anything seized was to be examined by a reserve military judge, a full colonel, who would decide what, if anything, was relevant to the question of Capt K's complicity in the perjury.

The magistrate for Barksdale was a full colonel, the deputy wing commander serving under the special court-martial convening authority. He authorized a search of the ADC office on October 21, 1995. The AFOSI was directed to seize, *inter alia:*

> Any and all documents or other evidence including case files, trial briefs, and motions in the above named case which provide evidence that Mr Anthony Calhoun, Mrs Dalphette Calhoun, Ms Channise Calhoun, Ms Candace Calhoun, Ms Latilka Calhoun, Ms Mona Jackson, Ms Robin O'Bannon, Ms Regina Kearney, and/or anyone identified as "Binky" lied, or that they planned or conspired to lie, or that Capt [K] knew that they lied, planned to lie, or conspired to lie in the case of *U.S. v. TSgt Clinton Calhoun.*

The office was searched that same day. No evidence was uncovered implicating Capt K. On the contrary, it was ultimately determined that appellant had, subsequent to the letter which triggered the investigation, but immediately before trial, explained to Capt K that it really had been Anthony at the wheel all along, and that he had invented the "Binky" story to protect his brother from the

marital repercussions of his liaison with Regina Cole.

Special Agent (SA) Preising, the case agent assigned to Capt K, had in the meantime been pressing the investigation on other fronts. In addition to some 16 people from the legal office, he specifically interviewed the bailiff in appellant's first trial, asking whether the bailiff had ever *overheard* any conversations between appellant and Capt K during the trial which might be useful in ascertaining whether there was a joint conspiracy to put on a perjurious defense. This proved a dry hole as well; nobody had heard anything implicating Capt K.

With Capt K cleared of any criminal or ethical wrongdoing, the government returned its attention to appellant. An Article 32, UCMJ, 10 U.S.C. § 832, investigation was scheduled. At this point, on February 22, 1996, Mr. J. Wayne Kastl formally entered an appearance as counsel for appellant, and requested a delay in the Article 32 investigation until April 9, 1996, which was granted. Nothing about that entry of appearance limited Mr. Kastl's representation in either scope or duration. On March 21, 1996, Capt Thomas Monheim, the ADC from Holloman AFB, New Mexico, was detailed as appellant's military counsel.

One of Mr. Kastl's first acts as counsel was to have his client petition the Barksdale wing commander to pay his attorney's fees. The commander denied this request on March 25, 1996, and the Article 32 investigation proceeded on April 9, 1996. Consistent with the recommendation of the investigating officer, the case was referred to a general court-martial and trial set for May 23, 1996. On May 2, 1996, Mr. Kastl advised the government that he would be seeking an extraordinary writ from the United States Court of Appeals for the Armed Forces (USCAAF), the gist of which was to require the Air Force to pay his fees to represent appellant, who had declared bankruptcy, at the pending court-martial, or to abate the court-martial altogether.

By letter of May 15, 1996, addressed to the military trial judge, Lieutenant Colonel Rosenow, Mr. Kastl announced that he was no longer the "attorney of record," but that he

was retained for a "related matter," *viz.*, the extraordinary writ to USCAAF. He went on to urge a delay in the trial proceedings, and then made the following representation: "AB Calhoun therefore absolutely refuses to entrust his case to any ADC (or other service military defense attorney) working in a system vulnerable to Government snooping." He explained that his motion would request "CAAF" to require the Air Force to either fund the costs of defense "by the undersigned or another civilian counsel" or abate the prosecution.

One day before trial, on May 22, 1996, USCAAF dismissed the petition for failure to comply with the requirement to originate petitions for extraordinary relief in the applicable Court of Criminal Appeals. Thereafter, Mr. Kastl filed a petition styled "Petition for Extraordinary Relief in the Nature of Writs of Mandamus and Prohibition," with this Court on June 3, 1996. In that petition he declared, on behalf of his client:

> [B]ecause of the outrageous Government invasion of his relationship with his former ADC, Petitioner understandably finds the entire Air Force defense program untrustworthy. More specifically, he fears that the Air Force might well again intrude upon an ADC workspace to steal his confidences. In short, he reasonably views the entire ADC program as vulnerable to continuing Government intrusions.... As a result, Petitioner insists that an inherent conflict exists between himself and the Air Force ADC entity. It has proved powerless to resist Air Force intrusions; *ergo*, he cannot entrust it with his confidences.
>
> . . . .
>
> Petitioner's "bottom line" is this: An Air Force which raided the unprotesting ADC law firm once can do so again. As a result, Petitioner Calhoun is neither foolish enough nor naive enough to entrust his case to any ADC lead counsel within a system which has proved vulnerable to objectionable Governmental interference.

Even though the above assertions limited themselves to appellant's alleged opinion of the Air Force defense system, Mr. Kastl's

petition went on, without explanation, to declare that appellant would refuse *any* government or military counsel, even one from another service. Lest there be any mistake about who would be representing appellant at the court-martial, Mr. Kastl set forth his fee schedule in the petition—$5,000 plus expenses for the court-martial itself, $6,000 for the appeal to this Court should one be necessary, and $3,000 more for an appeal to US-CAAF. The petition concluded with, "Should the Government protest this expense, Calhoun's respectful reply is: 'You created this mess—not me.' "

A separate panel of this Court denied appellant's petition on June 7, 1996, not on its merits, but because the subject matter of the relief requested was not properly the subject of an extraordinary writ. Instead, the Court declined to intervene in the case, holding that the military trial judge was fully empowered to consider, act upon, and render appropriate relief.

Meanwhile, the court-martial had already convened on May 23, 1996, 10 days *before* Mr. Kastl filed his writ with this Court. The pre-assembly Article 39(a), UCMJ, 10 U.S.C. § 839(a), session quickly foundered on the question of appellant's representation. True to the representations ostensibly made on his behalf by Mr. Kastl, appellant refused all offers of counsel except Mr. Kastl, who was not, of course, present. Capt Monheim, who had been co-counsel with Mr. Kastl at the Article 32 hearing, was present at counsel's table, but appellant specifically declined him as counsel, insisting that he wanted civilian counsel with Capt Monheim assisting.

After taking extensive testimony, and considering the brief prepared by Mr. Kastl for the extraordinary writ along with the correspondence Mr. Kastl sent him, the military judge declined either to dismiss the charges or to order the government to fund a civilian lawyer, the only forms of relief requested in Mr. Kastl's brief. For his part, appellant repeatedly, and adamantly, insisted that he was not willing to defend himself, averring

that he had been in contact with the NAACP, and that they could be expected shortly to decide if they would defend him. He asked for the trial to be delayed until the NAACP could decide. Reluctantly, the military judge granted the request, recessing until June 26, 1996.

On that date, appellant appeared, again without designated counsel, although Capt Monheim was again present. He asked for another continuance, claiming that he was engaged in ongoing discussions with local representatives of the NAACP, but that they had not yet had time to consider his request. Denying the request, the military judge gave appellant three options: to appear *pro se;* to appear *pro se* but with Capt Monheim available at the table for legal consultation; or to accept Capt Monheim as his lawyer. Despite strenuous and dire warnings from the judge about the perils of self-representation, appellant "elected" to represent himself, insisting all the while that his was not a voluntary election, but made in response to the Air Force's refusal to fund a civilian lawyer for him. He chose not to enter into an attorney-client relationship with Capt Monheim, preferring to keep him at the defense table as a "legal consultant."

Considering that it was a *pro se* litigation, the trial proceeded in the main without incident. Appellant was convicted of all the specifications save that relating to Adrienne Phillips. (That acquittal, we suspect, had less to do with appellant's performance as his own lawyer than it did with what the trial judge charitably termed Ms. Phillips' "lack of candor" on the stand.) Given appellant's sworn admissions during the providence inquiry at his first trial, his conviction was altogether unsurprising. However, the sentencing portion of his hearing suffered from a predictable lack of organization, direction, and the intangible impediment of making one's own "gimme a break" argument.

Originally, we received an appellate brief containing five issues.[3] Thereafter, on June

---

3. I. WHETHER THE IMPROPER SEARCH OF APPELLANT'S DEFENSE COUNSEL'S OFFICE BY AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS AGENTS AFTER APPELLANT'S (FIRST) SPECIAL COURT–MARTIAL REQUIRED THE AIR FORCE TO APPOINT AND FUND CIVILIAN DEFENSE COUNSEL FOR

3, 1997, we specified three additional issues.[4] The following day, Mr. Kastl filed what purported to be an "entry of appearance" which we received on June 16, 1997. That same day we issued an order indicating we were strongly inclined to disallow a re-entry of appearance on the part of Mr. Kastl on the basis of what we viewed then to be an irreconcilable conflict of interest. On June 30, appellant filed a brief, authored by military appellate defense counsel, addressing the specified issues and arguing that Mr. Kastl had, indeed, been ineffective. Nevertheless, in a declaration dated the same day, appellant asked that Mr. Kastl, who notwithstanding the specified issues going to his representation of appellant had apparently been in contact with appellant's family, be permitted to argue the original assignments of error.

This prompted the government to file a motion urging that we withdraw the specified issues in view of appellant's "waiver" of the ineffective assistance issues implicit, in the government's opinion, in his June 30 declaration. We denied that motion, and refused to permit Mr. Kastl's re-entrance as counsel on July 10, 1997.

Although mooted for the most part by our disposition of this case, the original assignment of error I, particularly, is interwoven with the reasoning behind our holding in

specified issue I.A. To avoid any confusion as to the basis for our holding, we will discuss them consecutively.

## I. Whether Search of ADC Office Required USAF to Pay for Civilian Defense Counsel

This assignment of error is essentially that brought by Mr. Kastl first to our superior Court, then to us in his petition for extraordinary relief. It was raised on appeal by military appellate defense counsel pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and rehearses in principal portion the arguments Mr. Kastl advanced in his petition. Pared of its sometimes florid invective, Mr. Kastl's contentions amount to this: the government's conduct was so outrageous in searching the ADC office that the government should either drop the charges, or, in the alternative, pay for a civilian counsel of appellant's choice.

Implicit in this syllogism is that the government may *never* search the office of an Area Defense Counsel. This, of course, is simply untrue. *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (neither Fourth nor Fifth Amendment *per se* prohibits search of real estate attorney's office); *United States v. Smith*, 35 M.J. 138 (C.M.A.1992) (attorney-client communi-

APPELLANT'S SUBSEQUENT (SECOND) GENERAL COURT–MARTIAL.

II. WHETHER THE 8TH AIR FORCE STAFF JUDGE ADVOCATE WAS DISQUALIFIED FROM PROVIDING A POST–TRIAL RECOMMENDATION TO THE CONVENING AUTHORITY.

III. WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL PRIOR TO HIS GENERAL COURT–MARTIAL, WHICH WAS PREJUDICIAL TO HIM AND EVENTUALLY LED TO HIS GENERAL COURT–MARTIAL.

IV. WHETHER APPELLANT'S SENTENCE IS INAPPROPRIATELY SEVERE.

V. WHETHER THE ADDITION OF ARTICLE 58b, UCMJ, VIOLATES THE *EX POST FACTO* CLAUSE OF THE CONSTITUTION WITH RESPECT TO APPELLANT.

4. I. WHETHER APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHERE:

A. AFTER ENTERING INTO AN ATTORNEY–CLIENT RELATIONSHIP WITH APPEL-

LANT ON THE CASE *SUB JUDICE,* COUNSEL UNILATERALLY WITHDREW FROM REPRESENTATION, FAILED TO APPEAR AT TRIAL TO LITIGATE AN ISSUE HE UNSUCCESSFULLY RAISED AT THE APPELLATE LEVEL BUT WHICH WAS REMANDED TO THE TRIAL COURT FOR RESOLUTION, EFFECTIVELY FORCING APPELLANT TO BE WITHOUT COUNSEL AT HIS COURT–MARTIAL.

B. COUNSEL ATTACHED TO HIS "BRIEF IN SUPPORT OF PETITION FOR EXTRAORDINARY RELIEF IN THE NATURE OF WRITS OF MANDAMUS AND PROHIBITION" A SEVEN PAGE STATEMENT OF APPELLANT'S MILITARY TRIAL DEFENSE COUNSEL CONTAINING PRIVILEGED ATTORNEY–CLIENT INFORMATION PREJUDICIAL TO APPELLANT.

II. WHETHER CIVILIAN COUNSEL CREATED A PERSONAL, FINANCIAL STAKE IN THE RESOLUTION OF HIS PETITION FOR EXTRAORDINARY RELIEF, AND, IF SO, CREATED THEREBY A CONFLICT OF INTEREST ADVERSE TO APPELLANT'S RIGHT TO CONFLICT–FREE REPRESENTATION.

cations may be subject of compelled disclosure). The Sixth Amendment does not provide sanctuary for criminal wrongdoing, nor may a client house his criminal enterprises in his lawyer's office.

 Even if we accepted appellant's contention that Capt K's letter did not amount to probable cause to search the ADC's office, or allowed the fact that nothing incriminating was found to influence our judgment respecting probable cause, the proper remedy for such an action is the exclusion of evidence. *Compare United States v. Patterson*, 25 M.J. 650 (A.F.C.M.R.1987), *pet. denied*, 26 M.J. 230 (C.M.A.1988) (warrantless search of off-base residence by military law enforcement agents, where military judge properly excluded fruits therefrom, insufficient to justify reversal). Nothing in the factual context of this search approached the "outrageous conduct" so offensive to notions of fundamental due process as to require the extraordinary sanction of dismissing charges. Dicta in *Patterson* speculated on the kind of government conduct that might justify overturning a conviction—behavior so outrageous as to "be fundamentally unfair or shocking to a universal sense of conscience which generally includes: coercion, violence or brutality to the person." *Id.* at 651. We have none of that here.

That said, we are not called upon to decide the legality of the search itself, since both sides agree no evidence derived from that search was used against appellant. The real question is whether, in view of the totality of circumstances surrounding the search of Capt K's office, it was *unreasonable* for the appellant here to be unwilling to enter into an attorney-client relationship with another lawyer within the Air Force's trial defense counsel bar.

 We begin with the obvious proposition that a military accused is entitled to conflict-free representation, both at trial and on appeal. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *United States v. Carter*, 40 M.J. 102, 105 (C.M.A. 1994). The trial judge shoulders a heavy burden to ensure that an accused is afforded conflict-free counsel. *Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). In this case, the trial judge was hamstrung in his efforts to ensure appellant got conflict-free counsel because of behind-the-scenes machinations which put the case in a Catch–22 posture. Mr. Kastl was not there to make the argument he had been hired to make. Consequently, the trial judge had the benefit only of Mr. Kastl's brief, which brushed fleetingly over the question of conflict of interest to concentrate on the theme that the government ought to be punished for its invasion of the ADC office at Barksdale—punishment to be effected by the payment of Mr. Kastl's fees.

We hold that under the extraordinary factual context of this case, it was not unreasonable for appellant to refuse to enter into an attorney-client relationship with anyone within the Air Force Legal Services Agency (AFLSA) chain of command. *Cf. United States v. Nichols*, 42 M.J. 715, 718 (A.F.Ct. Crim.App.1995), *pet. denied*, 43 M.J. 429 (1995) (Army judge appointed to preside over court-martial of Air Force ADC where AFLSA commander, who also commanded Air Force trial judges, had preferred charges against ADC). Weighing heavily in our conclusion is the fact that the AFLSA commander had a role in the decision to search a subordinate's office within his chain of command. In making this statement, we do not pass judgment on the manner of the search, the efforts undertaken to protect attorney-client material, nor do we vouchsafe an opinion on its necessity. Those questions are not before us. What we must decide is whether the search constituted behavior so outrageous as to warrant the draconian remedy suggested in *Patterson*. We decide that it was not.

But from appellant's perspective, it is easy to see how things must have looked much different. As the government interpreted Capt K's letter, both Capt K and Mr. Keene were on notice of planned perjury. Yet, only his *Air Force* attorney's office was searched. An OSI agent had questioned people as to whether they had overheard presumably privileged communications between his *Air Force* lawyer and himself. The same chain of command which had, at least, not protest-

ed the search of his lawyer's office was now appointing another Air Force lawyer, who answered to them, to represent him.

■ The Air Force's answer to the constitutional underpinnings articulated in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), was to provide at least one, and often two, defense counsel, irrespective of indigency, to each military accused. These counsel were to be "independent" inasmuch as they reported up a chain of command separate from the base legal office, the convening authority, and the installation and the operating units thereon. The defense chain of command, however, fuses at the apex (along with the circuit prosecutors) in the person of the AFLSA commander. Whether or not a defense counsel within that chain of command would actually be inhibited in presenting arguments to a court-martial which, however indirectly, might impugn the judgment of his superiors, is something we need not address. To appellant or any other objective layman, it fairly might appear so. Thus we hold that where the government takes the extraordinary measure of searching a military defense counsel's office, with the particular purpose of looking at case files pertaining to a given individual, a natural consequence of that decision is that special arrangements may become necessary for the defense of that individual should he be prosecuted later on.

We go that far and no farther. Those special arrangements need not, necessarily, entail the funding of a civilian counsel of an accused's choosing. While Capt Monheim competently presented the substance of Mr. Kastl's arguments on May 23, those arguments presented the trial judge with a false dichotomy—either pay for a civilian lawyer, or dismiss the charges. The trial judge was further aware that an extraordinary writ was pending at the appellate level, but that there had been no disposition. The insistence in Mr. Kastl's brief and letter to the military judge that appellant would accept no counsel employed by the government was unreasonable. Worse, it effectively painted his client, and the trial judge, into a corner.

In the Kastl brief, repeated references are made to appellant's lack of confidence in Air Force defense counsel, yet no reason is given for the extension of that distrust to *all* government counsel. This was essentially not explored at all, as it should have been, with the appellant at his trial. The trial judge refrained from asking why the designation of any other counsel, who did not answer to the AFLSA chain, would not have alleviated appellant's concerns, or, in the extreme, why counsel from another service or government agency would not do. Full exploration of the ramifications of this omission will be explored in the succeeding discussion.

*Specified Issue IA: Ineffective Assistance of Counsel based upon Unilateral Withdrawal from Representation*

As noted above, the trial judge's considerations with respect to appellant's counsel was impaired (fatally as it turns out) by the absence of appellant's lawyer. The government argues in its brief, as Mr. Kastl did through his various submissions, that his representation of appellant was "limited" to the Article 32 investigation and prosecution of the extraordinary writ. We reject this argument categorically. The contention that the extraordinary writ was a "related matter," when it dealt with the very heart and soul of appellant's *ongoing* court-martial and impinged directly on appellant's decision with respect to his representation at that court-martial, is utterly without merit. At no time, until after the fact, was this purported limitation made clear, and it is granted that at no time did Mr. Kastl, having once entered an appearance on behalf of his client at the Article 32 hearing, seek leave of the court to withdraw.

■ The right to effective assistance of counsel applies whether counsel is detailed, or selected by the accused. *Cuyler v. Sullivan*, 446 U.S. at 344–45, 100 S.Ct. at 1716–17; *United States v. Scott*, 24 M.J. 186, 188 (C.M.A.1987). We point this out because much of the government's argument and that of our dissenting brother on this issue centers on the principle of waiver. In particular the government hammers on appellant's June 30, 1997, affidavit in which he requested, notwithstanding our specified issues, that Mr. Kastl be permitted to argue the *original*

assignments of error in oral argument. This, the government contends, constituted a waiver of the effectiveness of counsel issue.

■ In the first place, we don't read the affidavit as broadly as the government. Hardly waiving the issue, in his June 30 affidavit appellant specifically requested that appointed appellate counsel be permitted to argue the question of the effectiveness of Mr. Kastl, while allowing Mr. Kastl to argue other issues.[5] In the second, appellant's subjective satisfaction with counsel's performance, or any alleged conflict, is not the right yardstick. It is, as the government concedes, an objective standard. Third, we have an independent responsibility to disqualify counsel where the public interest in maintaining the integrity of the judicial system outweighs the accused's constitutional right to counsel of his selection.[6] *In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 250–251 (2d Cir.), *cert. denied sub nom., Roe v. United States*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986). Thus, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159, 108 S.Ct. at 1697. Finally, the waiver argument ignores our solemn responsibility to ensure that an accused is given a fair trial, and that the constitutional guarantees to effective, conflict-free assistance of counsel, that transcend principles of waiver, are scrupulously honored. *Id.* at 160, 108 S.Ct. at 1697.

■ The standard of review for claims of ineffective assistance of counsel is set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and has been adopted by the United States Court of Appeals for the Armed Forces in *United States v. Ingham*, 42 M.J. 218 (1995), *cert. denied*, 516 U.S. 1063, 116 S.Ct. 745, 133 L.Ed.2d 693 (1996). *Strickland* requires an appellant to show that counsel's performance was deficient, so far short of competence that it is as though no counsel were present at all. Second, there must be prejudice so great as to cast doubt upon the reliability and fairness of the trial itself. *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993) (quoted in *United States v. Christy*, 46 M.J. 47, 50 (1997)).

Mr. Kastl first entered an appearance as the defense counsel for appellant before the Article 32, pre-trial investigation. There was not then any intimation that his representation was limited in either scope or duration. Representation at the Article 32 investigation establishes an attorney-client relationship which cannot be terminated without good cause. *Cf. United States v. Kelly*, 16 M.J. 244, 247 (C.M.A.1983). It was not until later, after a court-martial convened, that Mr. Kastl advised the military trial judge by facsimile that he was no longer the "attorney of record" in the case. The effect of this unilateral withdrawal, in conjunction with Mr. Kastl's evident admonition to appellant that accepting any Air Force counsel would moot the question of whether the Air Force should pay his fees, left his client little choice but to proceed *pro se* at his court-martial.[7]

With certain exceptions not here relevant, under the ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.16(b) (1995), a lawyer may withdraw from representation provided it can be accomplished "without material ad-

---

5. We do agree with the government that such a situation would have been "ludicrous." Consequently, we forbade it.

6. Of course this right is not unalloyed. An accused may not insist on representation by an attorney he cannot afford, or who for other reasons declines to represent him. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988).

7. The dissent's point that Mr. Kastl "volunteered" to return and defend appellant needs

context. The complete sentence reads, "At one point shortly before the scheduled trial date, Mr. Kastl said he'd be willing to go in and represent me, *but he strongly recommended that I go in alone instead.* ... He told me there was no way that any decision that denied counsel for me could be upheld on appeal." (Emphasis added.) Elsewhere, appellant writes, "I kept getting the impression that he felt it wouldn't make any difference whether he went in or I went in alone and that he didn't want to represent me further."

verse effect on the interests of the client." Subsection (c) contains a significant limitation on an attorney's freedom to withdraw, declaring, "When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating the representation." Our military jurisprudence echoes these rules. Before an attorney is permitted to withdraw, he must secure the permission of an appropriate authority or have the express consent of the accused. MANUAL FOR COURTS-MARTIAL, UNITED STATES, Part II, Rules for Courts–Martial (R.C.M.) 506(c) (1995 ed.); *United States v. Acton*, 38 M.J. 330, 337 (C.M.A.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994).

■■■■ The only "cause" ever tendered, albeit informally, for Mr. Kastl's abandonment of his client and his failure to request leave of the court to do so, was that he was only paid for representation at the Article 32 and for the extraordinary writ, and that appellant understood that. This is insufficient.[8] The comment to Rule 1.16 states that "A lawyer should not accept representation in a matter unless it can be performed competently, promptly, without improper conflict of interest to completion." If appellant could not put together enough money to pay his lawyer for representation in this case, and counsel knew it, then he was obliged not to accept employment, or to confront the possibility that at least part of his representation would go uncompensated.

■■■■■ An attorney who agrees to represent a client in a court proceeding assumes a responsibility to the court as well as to the client. The professional relationship, as well as the decision to dissolve it, must be guided, and in some instances is governed by, the court's rules of professional conduct and by the canons and rules of the legal profession applicable to the members of the bar admitted to practice before the court. *Gibbs v. Lappies*, 828 F.Supp. 6, 7 (D.N.H.1993). Nonpayment or inability to pay fees is insufficient, of itself, to permit withdrawal of counsel, particularly in the criminal setting. *See, e.g., United States v. Davis*, 36 M.J. 702, 706 (A.C.M.R.1992), *pet. denied*, 38 M.J. 222 (1993) (citing *United States v. Uptain*, 531 F.2d 1281, 1290 (5th Cir.1976)). Mr. Kastl's unilateral withdrawal on the eve of trial, without regard to the obvious prejudice that withdrawal entailed should the extraordinary writ tactic fail, fell short of the minimal standards of competence and professionalism expected of members of the military bar. Worsening matters, the failure to request, much less get, the trial court's permission to withdraw foreclosed any course of action which might have been fashioned to mitigate the prejudice to his client. We need not even compare the simile of the first prong of *Strickland*. It was not *like* no counsel were present. Counsel simply was not present at his client's felony trial, period, even though he continued to purport to represent and advise appellant *after* a critical portion of that trial had already taken place.

---

8. Appellant's acquiescence to Mr. Kastl's limitation on representation, given it was informed by his own understanding of the merits of Kastl's arguments, and the concomitant need to "preserve" those arguments by going it alone at his court-martial, cannot be accepted as a knowing and informed consent as the dissent implies. In a post-trial affidavit, appellant relates that Mr. Kastl, after learning of the failure of the extraordinary writ, "declined to go in and represent me at the trial. He said he felt he couldn't win the case and didn't want to go to trial. I didn't have the money to pay him so I didn't push it at that point." Despite his having "withdrawn" from the case, Mr. Kastl continued to advise appellant as to how to proceed even after trial on the merits had begun, telling him that he should renew his request for a civilian lawyer. Appellant relates that Kastl told him "I should refuse military counsel and represent myself if neces-sary" because "I'd 'blow the issue' if I accepted military counsel." Appellant concludes, "Now, I think he may have been as concerned about getting himself paid and preserving an issue that he could argue on appeal as he may have been about what would happen to me at trial. I went into trial without any legal training or experience based upon the recommendation of my lawyer, Mr. Kastl." Based upon the foregoing, and notwithstanding appellant's condign reputation for lack of candor, we are mystified by the dissent's conclusion that the record does not support the conclusion that Mr. Kastl counseled appellant to fend for himself. Appellant's entire understanding of the legal posture of the case was colored by the filter of what his lawyer told him. In this instance, at least, appellant's claims are not only credible, but fully corroborated by his subsequent actions.

The consequences of Mr. Kastl's withdrawal were profound, and operated directly adverse to his client. Knowing that court-martial was pending on May 23, 1996, Mr. Kastl first filed his extraordinary writ in the wrong court. *See* COURT RULES FOR THE UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES, Rule 4(b)(1), 43 M.J. CLXXVIII (1995) ("Absent good cause, no [petition for extraordinary relief] shall be filed unless relief has first been sought in the appropriate Court of Criminal Appeals. Original writs are rarely granted."). The result was that the petition for relief was not even *filed* with this Court until 10 days after the court-martial had convened, and after the military trial judge had denied the relief sought without the benefit of having Mr. Kastl there to argue it.[9]

The prejudice of all this is self evident. It is hard to imagine how an accused's rights could be more prejudiced than by being forced to represent himself at his felony trial. *New Hampshire v. Emanuel,* 139 N.H. 57, 649 A.2d 53, 56 (1994).

*Specified Issue II: Counsel Created a Conflict of Interest by Making His Continued Representation Contingent Upon Government Payment of His Fees*

ABA MODEL RULE OF PROFESSIONAL CONDUCT Rule 1.5(d)(2) (1995) prohibits attorneys from entering contingent arrangements when representing a defendant in a criminal case.

*Cf. Commonwealth v. Little,* 418 Pa.Super. 558, 614 A.2d 1146, 1149 (1992) (attorney not faulted for declining contingency fee arrangement in criminal defense). Mr. Kastl's prosecution of the extraordinary writ certainly looks like a contingency arrangement. If he won, then in all likelihood he would be paid by the government and would represent appellant at trial.[10] But if he lost, appellant could fend for himself. That situation highlights the obvious reason for the prohibition. A contingency arrangement in a criminal case places an attorney's interest at variance with that of his client—a built-in conflict. In this case, to preserve Mr. Kastl's interest (payment of his fees), he counseled his client to go *pro se* at his own felony trial. This advice, along with the otherwise inexplicable refusal to consider *any* government counsel, helps us to conclude that this arrangement created an actual conflict of interest which can neither be waived by appellant nor countenanced by this Court. Effectively, the extraordinary writ procedure, containing the false dichotomy discussed earlier, walked appellant into an ambush of his counsel's making, and held appellant's liberty interest hostage to its success or failure. This is a situation which need not and should not have been created. "Either pay me, or my client gets it."

Loyalty is the touchstone of an attorney's relationship to a client. A lawyer is prohibited from representing a client if that representation may be materially limited by

---

**9.** This crucial datum was never brought to this Court's attention in the writ application, even though Mr. Kastl must have been aware of it, as the application emphasizes that relief should be afforded *before* trial, which, the petition continues, was to be on June 26. Since the June 26 trial date was set by the military judge *after* denying the relief sought on May 23, there can be no question but that Mr. Kastl knew of the disposition below. In denying the writ, a separate panel of this Court aptly pointed out that the full measure of relief was available from the trial judge, obviously unaware that the trial court had already considered the substance of the petition and denied it. Neither was the panel aware that the trial court had not considered the alternative of appointing non-AFLSA or other outside government defense counsel because of the categorical exclusion of that course of action in Mr. Kastl's brief—the only thing the trial judge had to work from. We express no opinion as to how, if at all, the opinion on the writ might have

changed had the panel hearing it been fully apprised of the posture of the case, and the disposition of the issue by the court below.

**10.** We are unpersuaded by the dissent's point that, because appellant might have hired another civilian lawyer, there was no conflict of interest. Common sense tell us that in all likelihood Mr. Kastl would be the beneficiary of a favorable ruling on the question of civilian counsel. Even the fact that it was a distinct probability is sufficient to impermissibly tie Mr. Kastl's personal financial interest to the results of his representation of a criminal defendant. Furthermore, it is indisputable that he would *not* be paid if appellant forfeited the issue by accepting a military lawyer. Having a pecuniary interest, *any* pecuniary interest, which to be preserved requires your client to represent himself at his general court-martial, is enough for us. That he actually counseled appellant to do so clinches it.

the lawyer's own interests. ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7(b) (1995). Ethical duty is tightly interwoven with the Supreme Court's analysis of ineffective assistance claims. Ordinarily *Strickland* affords counsel a strong presumption of competence. But that presumption strictly relies upon the "legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065. When the legal profession's standards are not followed, no such presumption is appropriate, because "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Id.* at 692, 104 S.Ct. at 2067. Thus, an accused is denied his Sixth Amendment rights where counsel has an actual conflict of interest which adversely affected his performance. *Id.* (quoting *Cuyler v. Sullivan,* 446 U.S. at 335, 348, 100 S.Ct. at 1708, 1718); *see also United States v. Smith,* 36 M.J. 455, 457 (C.M.A.1993). In such a case, the *Strickland* presumption is reversed and prejudice is presumed. *Burger v. Kemp,* 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987) (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067).

■■■ The contingent arrangement embedded in the petition for extraordinary relief created exactly the kind of conflict of interest condemned by the ABA's model rules, the Supreme Court, and our superior Court. Although prejudice may be presumed under these circumstances, thus fully satisfying *Strickland,* we need not rely on a mere presumption. In this case the prejudice was direct and palpable. To preserve the "error" appellant was counseled to do without a lawyer at his trial. We accordingly answer this specified issue in the affirmative.

*Specified Issue IB: Whether Disclosure of Attorney–Client Confidences Amounted to Ineffective Assistance of Counsel*

After the first trial was over, Capt K prepared a seven-page statement entitled "Attorney–Client Confidences Relating to Airman Basic Clinton Calhoun III." It is a detailed, credible, blow-by-blow account of appellant's machinations leading up to and including his orchestration of the perjurious alibi defense. It is nearly entirely composed of matter privileged by the attorney-client relationship. Capt K evidently shared this statement with Mr. Kastl with a view toward furthering the latter's representation at the subsequent court-martial. It is a highly damning product in prosecution hands. Mr. Kastl attached this document to his petition for extraordinary relief for reasons which escape our understanding. Nothing contained within it was factually necessary to Mr. Kastl's argument. Every fact pertinent to the writ application could have been, and should have been, otherwise adduced. At trial, the prosecution sought to introduce it, and appellant was plainly surprised that the government had it. But the military judge wisely refused to let it in, appreciating the distinction between the evidentiary attorney-client privilege (which the attorney cannot unilaterally waive) and the ethical dimensions of the privilege. *See, e.g., United States v. Ballard,* 779 F.2d 287, 293 (5th Cir.1986) *cert. denied,* 475 U.S. 1109, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986); *Lawyer Disciplinary Board v. McGraw,* 194 W.Va. 788, 461 S.E.2d 850 (1995).

Our disposition of the ineffective assistance issue represented by the unilateral withdrawal and contingent arrangement renders further treatment of this issue unnecessary. In any event, in view of the judge's ruling, there can be no question but that appellant was not prejudiced by its disclosure.

*II. Whether 8th AF SJA Disqualified from Post–Trial Recommendation to the Convening Authority*

Our disposition moots the question of the post-trial recommendation. Should the government elect to retry appellant, the government may wish to consider whether it would be wise to avoid any appearance of unfairness by having a different convening authority consider it. We do not mean to imply wrongdoing on the part of 8th AF; however, their participation in the breach of the attorney-client relationship implicit in that search contributed to appellant's reluctance to have AF counsel, and their further participation in

any subsequent trial might create an appearance of unfairness that is entirely avoidable.

### Remaining Issues

The remaining issues are mooted by our resolution above with the exception of the *ex post facto* claim, which was resolved adversely to appellant in *United States v. Pedrazoli,* 45 M.J. 567 (A.F.Ct.Crim.App.1997).

### Disposition

The findings of guilty and sentence are set aside. A retrial may be held. Should appellant continue to decline representation from a judge advocate within the chain of command of the Air Force Legal Services Agency, conflict-free counsel from outside AFLSA shall be provided.

Judge J.H. MORGAN concurs.

PEARSON, Senior Judge (dissenting):

This case leaves a bad taste in my mouth, from its outset with the government's search of a military defense counsel's office to appellant's self-representation at trial. However, I am convinced that appellant received exactly the kind and extent of legal services that he contracted with Mr. Kastl to provide, and appellant has not shown by reliable evidence that those services were deficient.

First off, the record does not support the majority's conclusion that Mr. Kastl abandoned appellant to fend for himself in the courtroom. Instead, the record shows that Mr. Kastl and appellant agreed to limit the scope of counsel's legal services to representing appellant at the pretrial investigative hearing and a petition to the appellate courts for extraordinary relief on the government paid civilian attorney issue. Appellant's post-trial statements echo this as does the record of trial. *See* AMERICAN BAR ASSOCIATION MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.2(c) (attorney and client may agree to limit objectives or scope of services provided).

The military judge discussed Mr. Kastl's limited representation with appellant at several points and not once did appellant voice a contrary view, leaving the trial judge, and me, with the inescapable conclusion that appellant never retained Mr. Kastl for the actual trial. Moreover, appellant concedes in his post-trial statement submitted by motion of June 30, 1997, that Mr. Kastl volunteered to represent him at trial but appellant opted, for better or worse, for self-representation instead. In this regard, appellant did not even argue the government funded civilian attorney issue at trial. Instead, he opted to let his military attorney "consultant" run that one up the flag pole.

Next, there was no actual conflict of interest between Mr. Kastl and appellant. The thrust of Mr. Kastl's argument on the government paid attorney issue was that the government owed it to appellant to pick up the tab for a civilian attorney because it had tainted all government lawyers in appellant's eyes when it searched his former military defense attorney's office. Granted, Mr. Kastl raised a novel theory. However, it is a theory which the majority partially embraces by finding that a potential conflict of interest existed here for any Air Force attorney within the chain-of-command of the Air Force lawyer who sanctioned the search—an issue of first impression for this Court.

In making the funded civilian attorney argument, Mr. Kastl never argued that he had to provide those services. Instead, the trial judge is the one who kept bringing up the issue in the context of Mr. Kastl providing the legal services if he granted the defense motion for a government paid civilian attorney. However, appellant corrected the judge several times that he was asking for "any" government paid civilian counsel, period, which might or might not be Mr. Kastl. Furthermore, several times during the trial the judge brought Mr. Kastl's name back into the picture by asking appellant if he wanted to call Mr. Kastl for assistance and on each occasion appellant declined. Thus, the record does not support the majority's conclusion that Mr. Kastl had a financial stake in the outcome of the case that put him in conflict with appellant.

As for the disclosure of confidential communications portion of the majority opinion, the trial judge dealt fully with that issue after appellant objected when the prosecutor

tried to offer Captain K's letter to Mr. Kastl, which the latter had attached to his petition for extraordinary relief. After questioning appellant about the attorney-client privilege implications of the letter, the judge found that "Mr. Kastl was clearly acting within the scope of doing with this communication what he fully believed was in his client's best interest and he had permission from his client to do." Thus, the majority casts an undeserved stone here.

To reverse as the majority does, I would have to conclude (1) the trial judge erred in not advising appellant that military defense counsel had a potential conflict of interest by being in the chain-of-command of the Air Force attorney who sanctioned the search, or (2) a defense attorney's advice to an accused to represent himself at a criminal trial is incompetence *per se* (assuming our appellant is worthy of belief on that score). I briefly address both.

I agree with the majority that the government had to provide appellant with an attorney outside of the Air Force Legal Services Agency chain-of-command when the Agency's Commander sanctioned the search of the military defense counsel's office. A potential conflict of interest existed for any attorney within that chain-of-command. Thus, the trial judge should have advised appellant of Captain Monheim's potential conflict as a detailed defense counsel and whether appellant wanted to waive it. *See* R.C.M. 901(d)(4)(D) Discussion; *United States v. Hardy*, 44 M.J. 507 (A.F.Ct.Crim.App.1996). However, the judge's failure to do so here did not prejudice appellant.

Appellant knew that his claim for a government paid civilian attorney was based on the actions of his former military attorney's chain-of-command and the conflict of counsel issue it raised. With that knowledge, he only pursued the paid civilian attorney avenue and never voiced any objection to Captain Monheim staying on the case as an "assistant" to the lead civilian attorney. Moreover, the thrust of appellant's argument was that he would accept no military attorney as lead counsel. Consequently, the judge hardly prejudiced appellant by failing to inform him that Captain Monheim or any other Air Force full-time defense counsel had a potential conflict of interest.

Now, for the self-representation issue. While I find it highly unusual for any attorney to advise a client to represent himself in a criminal trial, we should look at each case using the *Strickland v. Washington* standards, which do not involve a *per se* rule for any aspect of an attorney's representation. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, we have only appellant's word as to what the attorneys advised him and his character for truthfulness comes up quite short on my credibility yardstick. Thus, before reversing for ineffective assistance of counsel on the *pro se* advice aspect, I would remand the case for a post-trial hearing with Mr. Kastl and Captain Monheim as witnesses to nail down the facts concerning whether they advised appellant to proceed *pro se* and, if so, why. Additionally, the hearing officer would determine what an attorney would have done differently in the presentation of the case than the appellant did *pro se*.

To sum up, many in today's society would say that every wrong deserves a remedy; however, I believe a self-inflicted one does not. From the record before me, I cannot conclude that appellant's *pro se* wound was other than self-inflicted—after all, he still wants Mr. Kastl to represent him on this appeal despite our specified issues concerning Mr. Kastl's competence in this case.